PD-1344-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/16/2015 8:30:10 PM
Accepted 11/17/2015 2:17:15 PM
ABEL ACOSTA
CLERK

**IN THE**
**TEXAS COURT OF CRIMINAL APPEALS**

JOSE E. DUQUE,

      Petitioner,

vs.                               No. _____

THE STATE OF TEXAS,

      Respondent.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

# PETITION FOR DISCRETIONARY REVIEW

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Rivera y Bujosa Law Office

Octavio M. Rivera-Bujosa
SBN 24081261
333 Simonton Street, Suite 210
Conroe, Texas 77301
Phone: (832) 296-6048
Fax: (936) 756-5961
oriverabujosahou@gmail.com

FILED IN
COURT OF CRIMINAL APPEALS

November 17, 2015

ABEL ACOSTA, CLERK

**PETITIONER REQUESTS ORAL ARGUMENT**

1

# IDENTITIES OF JUDGE, PARTIES, AND COUNSEL

**Jose E. Duque, Petitioner:**

Raul Rodriguez, attorney for Petitioner during the plea hearing before the trial court; 3801 Barnett Street Houston, Texas 77017-3019; Phone: (713) 641-4477; email: rrod1959@aol.com

Octavio M. Rivera-Bujosa, attorney for Petitioner at the Habeas Corpus Hearing, on appeal, and on Petition for Discretionary Review; 333 Simonton Street, Suite 210, Conroe, Texas 77301; email: oriverabujosahou@gmail.com; Phone: (832) 296-6048; Fax: (936) 756-5961

**State of Texas, Respondent:**

Ryan Mclearen, Harris County Assistant District Attorney, Attorney for Respondent at the Habeas Corpus Hearing; Harris County District Attorney's Office, 1201 Franklin Street, Suite 600 Houston, Texas 77002-1923, Phone: (713) 755-5800

Devon Anderson, Harris County District Attorney, Attorney for Respondent, Harris County District Attorney's Office 1201 Franklin Street, Suite 600 Houston, Texas 77002, Phone: (713) 755-5800

Melissa Hervey, Harris County Assistant District Attorney, Attorney for Respondent; Harris County District Attorney's Office 1201 Franklin Street, Suite 600 Houston, Texas 77002-1923; email: Melissa@dao.hctx.net

Lisa McMinn, State Prosecuting Attorney, Attorney for Respondent; P.O. Box 13046, Austin, Texas 78711-3046; Phone: (512) 463-1660; Fax: (512) 463-5724, email: Lisa.McMinn@spa.texas.gov.

Stacey M. Goldstein, Assistant State Prosecuting Attorney, Attorney for Respondent; P.O. Box 13046, Austin, Texas 78711-3046; Phone: (512) 463-1660; Fax: (512) 463-5724; email: information@spa.texas.gov

**184ᵗʰ Judicial District Court, Honorable Jan Krocker, Presiding Judge,** 17th Floor, Harris County District Court, 1201 Franklin St, Houston, Texas 77002.  Phone: (713) 755-6358; Fax: (713) 368-9219

**Justice Laura Carter Higley, Justice Terry Jennings and Justice Harvey G. Brown,** First Court of Appeals, 301 Fannin St, Houston, Texas 77002

# TABLE OF CONTENTS

Index of Authorities…………………………………………………………….………6-7

Statement Regarding Oral Argument……………………………………………….8

Statement of the Case……………………………………………………………….8

Statement of Procedural History…………………………………………………9

Abbreviations………………………………………………………....…..……….…9

Grounds for Review…………………………………………………...………….....10

Argument……………………………………………………………. ………..…11-25

1. The First Court of Appeals conducted an improper prejudice inquiry under *Padilla v. Kentucky*; the four-factor analysis applied by the First Court of Appeals in the instant case to guide its analysis of prejudice under *Strickland v. Washington*, failed to consider the totality of the circumstances that are material to the determination of whether or not a defendant has been prejudice by the legal advice of his incompetent counsel. By failing to consider in its analysis the totality of the circumstances surrounding the Petitioner, the First Court of Appeals applied an analysis that does not conform to the standard established by the SCOTUS……………………11-16

2. The First Court of Appeals' erred in its prejudice analysis, when it did not account for the possibility that Petitioner could have demonstrated prejudice by showing that it was reasonable for Petitioner, under the particular circumstances surrounding his case, to reject the State's plea offer to continue negotiate in hope of securing an immigration-friendly plea offer…………………16-25

   A) Petitioner was not forbidden from resetting the case in hope of securing a more immigration-friendly plea deal………19

   B) There were other reasonable plea alternatives that could have been negotiated and would have not put Petitioner in removal

        proceedings……………………………...…………19-21

C)    It was rational for the Petitioner to reject the State's plea bargain offer because of the impact that it would have had on his immigration status…………………………………21-23

D)    Deferred adjudication is not an option for a non-citizen when the predicate conviction is going to place the non-citizen in removal proceedings…………………….…………23-25

Prayer for Relief………………………………………………………25

Certificate of Service…………………………………………….………...27

Certificate of Compliance…………………………………………....….…27

Appendix……………………………    ………………………...........……28-29

# INDEX OF AUHORITIES

**Cases**

*Chaidez v. United States*, 133 S.Ct. 1103 (2013)..................................................................22

*Ex parte De Los Reyes,* No. 350 S.W.3d 723 (Tex.App.--El Paso 2011, pet. granted), rev'd on retroactivity grounds, 392 S.W.3d 675 (Tex.Crim.App. 2013). (memorandum opinion)…………………..…….................................14

*Ex Parte Duque*, No. 01-15-00014-CR, 2015 Tex. App. LEXIS 5040 (Tex.App.Houston Nov. 15, 2015) 393 S.W.3d 781 (Tex. Crim. App. 2013) (unpublished opinion)……………………………….……12, 17, 22, 24

*Ex parte Tanklevskaya*, 361 S.W.3d 86 (Tex. App. Houston [1st Dist.] 2011, pet. granted), *rev'd on retroactivity grounds*, 393 S.W.3d 787 (Tex. Crim. App. 2013)………………………………………….……14

*Ex parte Torres*, No. 08-12-00244-CR, 2014 Tex. App. LEXIS 3168, 2014 WL 1168929 (Tex. App. El Paso, March 21, 2014, *pet. granted*) (memorandum opinion) .......................................12, 13, 15

*Hill v. Lockhart,* 474 U.S. 52 (1985) ................................................ 11

*INS v. St. Cyr,* 533 U.S. 289 (2001)....................................................21

*Kovacs v. United States*, 744 F.3d 44 (2d Cir. 2014)....................................11

*Matter of Salazar-Regino,* 23 I&N Dec. 223 (BIA 2002)................................. .........20

*Missouri v. Frye*, 132 S.Ct. 1399 (2012) ...............................................11, 15

*Moosa v. INS,* 171 F.3d 994 (5th Cir. 1999)........................................….20

*Padilla v. Kentucky*, 559 U.S. 356 (2010) .........................................11, 13, 14, 15, 23

*Roe v. Flore-Ortega*, 528 U.S. 470 (2000) ................................................ 11

*Salazar v. State*, 361 S.W.3d 99 (Tex. App. Eastland 2011, *no pet.*)......................... 22

*State v. Sandoval*, 249 P.3d 1015 (Wash. 2011)......................................... 22

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................................ 11, 12, 15

*United States v. Batamula,* No. 12-20630, (5th Cir. 2015) .....................................15

*United States v. Choi*, 581 F. Supp. 2d 1162 (N.D. Fla. 2008) ...........................…..23

*United States v. Orocio*, 645 F.3d 630 (3d Cir. 2011)............................................. 22

*United States v. Rodriguez-Vega*, No. 13-56415, (9th Cir. 2015)............................ 13

**Statutes**

Code of Criminal Procedure art. 11.072................................................................8

Texas Penal Code § 22.01...............................................................................20

8 U.S.C. 1101(a)(48)(A)................................................................................20

8 U.S.C. 1182(a)(2)(A)(ii).............................................................................20

8 U.S.C. 1226(c)........................................................................................24

**Rules**

TRAP 9.4………………………………………………………..…………………27

TRAP 9.5………………………………………………………………………...………….27

TRAP 66.3(a)…………………………………………………..…………..8, 16

TRAP 66.3(b)…………………………………………………...…………………9, 16

TRAP 66.3(c)………………………………………………….8, 16

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner believes oral argument would be helpful to the Court because the issues raised in the instant Petition are issues that address a conflicting decision with another court of appeals' decision on the same issue and also, it has not been , but should be, settled by this Honorable Court. Petitioner respectfully believes that these issues could be better discussed in the context of oral argument, where the Court can ask questions and consider alternatives that counsel is prepared to discuss.

## STATEMENT OF THE CASE

This case concerns a defendant that was advised to accept the State's plea offer by his plea counsel, less than an hour after the counsel had met the defendant in the holdover cell, for the very first time.[1] Those thirty (30) to sixty (60) minutes did not allow plea counsel to conduct any type of investigation regarding the merits of defendant's criminal case, or the immigration consequences of defendant's guilty plea.[2] A few months after defendant pleaded guilty, defendant was put into removal proceedings and ordered removed from the United States.[3] Defendant lost his legal permanent status in the U.S. and was separated from his U.S. citizen wife and from his four (4) U.S. citizen children.[4] The Defendant filed an application for a writ of habeas corpus, under Texas Code of Criminal Procedure article 11.072 before the 184th District Court, Harris County, Texas. At the end of the writ hearing, the District Court stated that she "th[ought] it [was] a close call," but recommended denying the writ on the record.[5]

Defendant appealed the District Judge's decision to the Court of Appeals for the First District of Texas. The Court of Appeals noted, that there was no need to analyze the first prong of Strickland because the second prong, prejudice, was dispositive.[6] The Court of Appeals applied a four factor analysis to conclude that it would have not been rational for the defendant to proceed or to insist on going to trial.[7] This petition challenges the First Court of Appeals decision because the four factor analysis applied by the First Court of Appeals conflicts with the applicable decisions of the Supreme Court of the United States (SCOTUS) on this issue and with the decision of another court of appeals on this issue. TRAP 66.3 (c), (a). It

---

[1] 3 RR 11

[2] 3 RR 11

[3] *Ex Parte Jose E. Duque*, No. 01-15-00014-CR, 2015 Tex. App. LEXIS 5040 (Tex. App. Houston Nov. 15, 2015), pages 2-3

[4] 3 RR 46

[5] *Duque, at * 7*

[6] *Duque*, Id. *16

[7] Id *16

also concerns an issue that has not been, but should be, settled by this Honorable Court.  TRAP 66.3 (b).

## STATEMENT OF PROCEDURAL HISTORY

(1)  Date of opinion from Court of Appeals:  September 15, 2015.

(2)  Date of Motion for Rehearing:  None was filed.

(3)  Date Motion for Rehearing Disposed:  N/A

(4)  Date of Motion for Extension of Time:  October 15, 2015.

(2)  Date of Motion for Rehearing:

(3)  Date Motion for Rehearing Disposed

## ABBREVIATIONS AND REFERENCES

The required documents are  attached to this Petition in the Appendix.  The pages of the Appendix are numbered  in the lower, right-hand corner for ease of reference and use by the Court.

The Reporter's Record (RR) is referred to by volume number, then page number (e.g. 3 RR 69-80).

# GROUNDS FOR REVIEW

1.  The First Court of Appeals conducted an improper prejudice inquiry under *Padilla v. Kentucky*; the four-factor analysis applied by the First Court of Appeals in the instant case to guide its analysis of prejudice under *Strickland v. Washington*, failed to consider the totality of the circumstances that are material to the determination of whether or not Petitioner has been prejudiced by the legal advice of his incompetent counsel. By failing to consider in its analysis the totality of the circumstances surrounding the Petitioner, the First Court of Appeals applied an analysis that does not conform to the standard established by the SCOTUS.

2.  The First Court of Appeals' erred in its prejudice analysis, when it did not account for the possibility that Petitioner could have demonstrated prejudice by showing that it was reasonable for Petitioner, under the particular circumstances surrounding his case, to reject the State's plea offer to continue negotiate in hope of securing an immigration-friendly plea offer.

**ARGUMENT**

*1.* **The First Court of Appeals conducted an improper prejudice inquiry under *Padilla v. Kentucky*; the four-factor analysis applied by the First Court of Appeals in the instant case to guide its analysis of prejudice under *Strickland v. Washington*, failed to consider the totality of the circumstances that are material to the determination of whether or not Petitioner has been prejudiced by the legal advice of his incompetent counsel. By failing to consider in its analysis the totality of the circumstances surrounding the Petitioner, the First Court of Appeals applied an analysis that does not conform to the standard established by the SCOTUS.**

Under *Strickland v. Washington*, a defendant proves prejudice by demonstrating that without the attorney's error, the outcome of the proceeding at issue would have been different. 466 U.S. 668, 695 (1984). To demonstrate that the actions of counsel prejudiced a defendant when he entered a guilty plea, the defendant must show that it would have been rational under the circumstances to reject that plea in the absence of counsel's error. *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010); *Roe v. Flore-Ortega*, 528 U.S. 470, 480, 486 (2000). A defendant can establish the rational nature of the decision to reject the plea agreement by establishing a "reasonable probability" that "but for counsel's errors" she would have either "insisted on going to trial," *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) because of her desire to avoid deportation, or that she would have continued to negotiate for an alternative plea that mitigated the deportation consequence. *Missouri v. Frye*, 132 S.Ct. 1399, 1408-9 (2012) (Hill test is not the only test for prejudice); *Kovacs v. United States*, 744 F.3d 44, 52 (2d Cir. 2014) (prejudice where

showing that defendant would have continued to negotiate). Strickland mandates that courts employ a case-by-case "totality of the circumstances" standard for evaluating a defendant's claim of prejudice. 466 U.S. at 695.[8]

In conducting the prejudice inquiry in the instant case, the First Court of Appeals COA applied a test that was focused on determining whether or not it would have been rational for the Petitioner *to insist on going to trial* under the following *four (4) factors*:

(1) whether there is evidence of the applicant's guilt,

(2) whether the applicant had any factual or legal defenses,

(3) whether immigration status was his primary concern, and

(4) how the plea deal compared to the penalties risked at trial. *Duque*, at *16

As noted, the four (4) factor analysis does not consider the totality of the circumstances surrounding Petitioner at the moment when he entered his guilty plea. In doing so, the Court of Appeals failed to consider other factors that would have shown that Petitioner was prejudiced by his plea counsel's ineffective advice.

Additionally, the COA analysis fails to take into account weather or not it would have been rational for Petitioner to reject the State's plea offer *to pursue a more immigration friendly plea offer*. The COA analysis is being conducted from the perspective of whether or not it would have been rational under the

---

[8] Adopted from the Amicus Brief presented by the Texas Fair Defense Project "TFDP" filed in Ex parte Torres, No. 08-12-00244-CR, 2014 Tex. App. Lexis 3168, 2014 WL 1168929 (Tex. App. El Paso, March 21, 2014 , pet. granted)

circumstances *to insist on going to trial*. By focusing on whether or not it would have been rational under the circumstances to insist on going to trial[9], the COA failed to consider whether or not it would have been rational for Petitioner to reject the plea bargain offer tendered by the State *to try to pursue a more immigration-friendly plea offer*.

Petitioner respectfully submits to the consideration of this Honorable Court that the analysis applied by the COA does not conform adequately to the standard of proof enunciated by the SCOUT. As to this standard of proof, the U.S. Court of Appeals for the Ninth Circuit recently stated that "[a] 'reasonable probability' is a standard of proof 'sufficient to undermine confidence in the outcome' and is 'somewhat lower' than a preponderance of the evidence. Id. '[T]o obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.' *Padilla*, 559 U.S. at 372. Where ineffective assistance leads a petitioner to accept a plea bargain, a different result means that 'but for counsel's errors, [Rodriguez-Vega] would either have gone to trial *or received a better plea bargain.*' Howard, 381 F.3d at 882." *U.S.A. v. Rodriguez-Vega*, No. 13-56415, at 11-12 (9th Cir. 2015) (emphasis added)

Indeed, in *Ex parte Manuel Torres*, *supra*, the COA for the Eight District of Texas *rejected the State's invitation to apply the four factor analysis applied in the*

---

[9] *Duque*, at * 16 (emphasis added)

-13-

*instant case*. The COA for the Eight District reasoned that "[w]hile the State points us to a four-factor approach to prejudice that our sister circuit in Houston has taken that assesses a defendant's probability of success at trial,…, we have previously rejected *a solely merits-based prejudice analysis*, recognizing that '[d]eprivation of a trial' stemming from a *Padilla* violation 'is a structural defect, which amounts to a serious denial of the entire judicial proceeding itself, and it demands a presumption of prejudice.' *Ex parte De Los Reyes*, 350 S.W.3d 723, 730 (Tex.App.--El Paso 2011, pet. granted), rev'd on retroactivity grounds, 392 S.W.3d 675 (Tex.Crim.App. 2013). '*The focus of the prejudice inquiry . . . is whether the defendant was deprived of a particular proceeding by counsel's deficient performance, not whether the outcome of that proceeding would have been favorable to the defendant.*' *Id*. at 731. 'Therefore, the defendant must demonstrate that but for counsel's performance, he would have availed himself of the proceeding in question.' *Id*. In assessing prejudice, 'we are to consider the circumstances surrounding [the] guilty plea and the gravity of the advice that [the defendant] did not receive as it pertained to [the defendant's] plea determination.' *Ex parte Tanklevskaya*, 361 S.W.3d at 97…In viewing the totality of the circumstances, we find that Appellant has met his burden in establishing prejudice. *Ex parte De Los Reyes*, 350 S.W.3d at 730. *Such prejudice could not be cured by the one paragraph admonishment in the plea papers stating that the plea 'may' result in his removal*. Id. at 731; *Ex parte Tanklevskaya*, 361

S.W.3d at 99." *Torres*, at * 11-12 (emphasis added)

Similarly, the U.S. Court of Appeals for the Fifth Circuit recently stated that "[w]ere we to hold that the judge's mere statement to Batamula during his plea colloquy that he would '*likely*' be deported vitiated his ability to establish prejudice under Strickland and Padilla, *we would be turning a blind eye to the reality of the plea bargaining and plea colloquy process and flouting the Supreme Court's mandate that a defendant has a constitutionally protected right to the effective assistance of counsel throughout the pre-plea stage*—a right that carries more than can be supplied by a judge's general and equivocal last-moment warning that deportation is likely to result from the guilty plea. '[C]riminal defendants require effective counsel during plea negotiations. Anything less . . . might deny a defendant effective representation by counsel at the only stage when legal aid and advice would help him.' Frye, 132 S. Ct. at 1407–08 (emphasis added) (internal quotation marks omitted) (second alteration in original)." *U.S.A. v. Innocent Batamula* 12-20630, at *15 (5th Cir. 2015) (emphasis added)

In sum, Petitioner respectfully submits to the consideration of this Honorable Court that the rationale cited above is indicative of the fact that COA for the First District of Texas erred in applying to the facts of the present case a prejudice analysis, that does not take into account the totality of the circumstances that would have made it rational for the defendant to reject the State's plea bargain offer to

continue negotiating an immigration-friendly plea bargain or insisting on going to trial.

More importantly, as previously discussed, the opinion issued by the COA for the First District of Texas conflicts with the decision issued by the COA for the Eight District of Texas on the same issue. *TRAP 66.3(a)* Therefore, Petitioner respectfully submits to the consideration of this Honorable Court that this important question of state and federal law should be, but has not been settled, by this Honorable Court. *TRAP 66.3(b).*

Finally, as to this matter, Petitioner asserts that by limiting the totality of the circumstances approach to the four factors previously mentioned, and also, by not considering the option of rejecting a plea bargain offer to continue negotiating a favorable plea offer, the COA for the First District of Texas erred in complying with the SCOTUS mandate that courts employ a case-by-case "totality of the circumstances" standard for evaluating a defendant's claim of prejudice. *TRAP 66.3(c)*

**2.    The Court of Appeals erred in its prejudice analysis when it did not account for the possibility that Petitioner could have demonstrated prejudice by showing that it was rational for Petitioner, under the particular circumstances surrounding his case, to reject the State's plea offer to continue negotiate in hope of securing an immigration-friendly plea offer.**

Petitioner respectfully submits to the consideration of this Honorable Court

that a closer look to the totality of the circumstances surrounding his case, would show that it would have been rational for him to reject the State's plea bargain offer.

In the case at hand, the trial court found that the testimony offered by Petitioner's previous attorney, Raul Rodriguez, was credible. *Duque*, at * 8

Attorney Rodriguez testified during the Habeas' hearing and made the following statements that are material to the prejudice inquiry:

1. That he was appointed to represent Mr. Duque back in 2012. 3 RR 10
2. That he spoke to Duque at the holdover cell, which is to the left of the courtroom. 3 RR 11
3. That Duque was charged with an offense of assault -- felony assault, third-degree felony of assault by impeding breathing. 3 RR 10
4. That he had a conversation with Duque about what he was charged with and the facts that were presented to him by the State. 3 RR 10
5. That the conversation between him and Duque lasted approximately 30 minutes to one (1) hour. 3 RR 11
6. That the aforementioned conversation was the only conversation that he had with Duque regarding Duque's case. 3 RR 11
7. That he discussed with Duque the information contained in the offense report. 3 RR 12
8. That he asked the State what was it that they wanted to do as far as maybe making a recommendation. 3 RR 12
9. That the State offered a two-year deferred adjudication probation if Duque was to decide to plea. 3 RR 12
10. That he went back to Duque and informed him of what he had; the option to go to trial or that the State was offering him a two-year deferred adjudication. 3 RR 12
11. That Mr. Duque decided to go ahead and accepted the two-year deferred adjudication probation. 3 RR 12
12. That Duque had informed him that he was not a U.S. citizen. 3 RR 12
13. That during his conversation with Duque he did not inform Duque that the offense to which Duque was pleading guilty was considered a crime involving moral turpitude for immigration purposes. 3 RR 14
14. That at the time he was not aware that the crime for which Duque was being charged was a crime involving moral turpitude for immigration purposes. 3 RR 14

-17-

15. That at any moment he told Duque that he was going to be put into removal proceedings as a result of the conviction for the offense that he was charged. 3 RR 15

16. That he was unaware at the time that the immigration consequence of pleading guilty to that offense was that Duque was going to be put into removal proceedings. 3 RR 15

17. *That knowing what he knows now about the immigration consequence of pleading guilty to the offense charged to Duque, he would have not given Duque the same advice*. 3 RR 15

18. That he did not know at the time that deferred adjudication could have a legal permanent resident removed from the United States. 3 RR 20

19. That he did not remember if he told the Judge of the warnings that he had given to Duque about his immigration status. 3 RR 21

20. That as a general rule, he will tell a defendant who is a legal permanent resident, that a guilty plea could result in deportation, denial of naturalization or denial of citizenship under federal law. 3 RR 18

21. That he (Rodriguez) acknowledged that the trial court admonished Duque that he could be deported. 3 RR 27

As this Honorable Court would notice, it is undisputed that Petitioner's plea attorney had just met him. 3 RR 10-11  It is also uncontested that, that same day, without conducting any type of investigation, after a thirty (30) minutes to one (1) hour conversation, and in total ignorance of the immigration consequences of Petitioner's guilty plea; Petitioner's plea attorney advised him to accept the State's plea offer. 3 RR 11-12

Petitioner was prejudiced by his counsel ineffective advice because his counsel's advice made him instantly or de facto deportable.  Petitioner respectfully brings to the attention of the Honorable Court the following circumstances, *that were not considered by the COA*, but from which this Honorable Court could infer that it was reasonable for the Petitioner, to reject the State's plea offer and either, continue

to negotiate in hope of securing a more immigration-friendly plea deal or taking his case to trial.

A) *Petitioner was not forbidden from resetting the case in hope of securing a more immigration-friendly plea deal*:

There was no rush to take the plea. It was just the first court setting. Petitioner was under no pressure to take the State's plea offer. Petitioner could have easily decided that he was going to wait for the State to discover the evidence before making such an important decision. Thus, Petitioner respectfully submits to the consideration of the Court that it is reasonable to think that if Petitioner would have been adequately informed of the immigration consequences of his guilty plea, he would have taken advantage of the fact that he was not pressure in any way to make a final decision in his case and would have negotiated in hope of securing a more immigration-friendly plea deal. The fact that Petitioner's plea attorney, could have reset the case to fully investigate the impact of the State's plea offer on the immigration status of the Petitioner, and chose not take advantage of that opportunity, was not considered by the COA and certainly prejudiced the Petitioner.

B) *There were other reasonable plea alternatives that could have been negotiated and would have not put Petitioner in removal proceedings*:

Petitioner's plea attorney did not conducted any type of negotiation in the instant case. He just asked the State for a plea offer and communicated it to the

-19-

Petitioner.

Sadly, there were several plea deals that would have not put the Petitioner in removal proceedings. In Petitioner's case, the State first offer was for deferred adjudication. It is well to remember that for immigration purposes, deferred adjudication community supervision is the same as a conviction.[10], [11] Therefore, Petitioner could have negotiated other similar plea deals that would be considered a conviction under Texas Law but that would have not put him in removal proceedings. For example, Petitioner could have pleaded guilty to the offense of "Assault Family Violence", a Class C Misdemeanor[12] *with a punishment recommendation of* <u>*almost six months of imprisonment; no probation*</u>. That plea offer would have not put the Petitioner in removal proceedings because *Petitioner had no prior convictions*.[13] Thus, the proposed conviction would have fallen within the "*Petty Offense Exception*" for immigration purposes and it would have not have a negative impact on Petitioner's immigration status.[14]

More importantly, there is no reason to believe that the State would have been reluctant to agree to this type of plea offer when the same conveys a harsher

---

[10] See 8 U.S.C. § 1101(a)(48)(A); Matter of Salazar- Regino, 23 I&N Dec. 223 (BIA 2002); Moosa v. INS, 171 F.3d 994, 1005-1006 (5th Cir. 1999).

[11] The fact that deferred adjudication is considered a conviction for immigration purposes was also ignored by Duque's plea counsel. 3 RR 20

[12] Texas Penal Code § 22.01

[13] See 3 RR 46, (Q. "Besides the offense for which we are here today, have you ever been convicted of any offense during the 17-year period that you have been living in the United States?" A. "No.")

[14] Immigration and Nationality Act, Section 212(a)(2)(A)(ii) Exception.-Clause

punishment than the two (2) years deferred adjudication that was offered to Petitioner's plea attorney. Thus, it is reasonable to think that if Petitioner would have been adequately informed of the immigration consequences of his guilty plea, he would have negotiated and accepted a plea offer that would have put him in jail for almost six months, but that would have not put him in removal proceedings.

The fact that Petitioner's plea attorney did not advocate for other plea bargain options that would have not put the Petitioner in removal proceedings, was not considered by the COA and certainly prejudiced the Petitioner.

C) *It was rational for the Petitioner to reject the State's plea bargain offer because of the impact that it would have had on his immigration status*:

It bears repeating that the Supreme Court has consistently recognized the fact that for a non-citizen like the Petitioner, preserving his right to remain in the United States may be more important than any potential jail sentence. *INS v. St. Cyr*, 533 U.S. 289, 322 (2001) Ergo, it is not irrational for a defendant to reject a plea agreement offer in favor of pursuing an alternative plea offer, or a trial, even at the risk of a more serious conviction or sentence, because the defendant wants to avoid deportation.[15]

Petitioner's case is no different.

---

[15]*See, e.g., State v. Sandoval*, 249 P.3d 1015, 1021-1023 (Wash. 2011); *United States v.Orocio*, 645 F.3d 630, 645 (3d Cir. 2011) (abrogated on retroactivity grounds by *Chaidez v. United States*, 133 S.Ct. 1103 (2013)). *See also Salazar*, 361 S.W.3d at 102 (holding the decision to reject an offer of up to two years in state jail and up to a $10,000 fine, to face a potentially longer sentence at trial, in order to avoid deportation would have been rational given defendant's lack of criminal history and young age)

Petitioner is a native of Honduras who entered the United States in 1997. *Duque*, at * 2  By October 8th, 2012, Petitioner had been living in the United States for more than seventeen (17) years. 3 RR 46 During those years in this country, Petitioner got married and had four (4) children.[16]   According to Petitioner, those children are the reason why he is fighting to stay in the United States, because his children are all minors and they need him because his wife did not work. 3 RR 46 Petitioner also stated that he had obtained a lawful permanent resident status and was authorized to work in this country. *Duque*, at * 2

Based upon the foregoing, it is extremely difficult to imagine a reason why Petitioner's primary concern on October 8th, 2012 would have not been his immigration status. The fact that Petitioner informed the trial court of his desire to remain in this country, the lengthily residency, the strong family ties to this country and his employment history in this country are excellent indicators of the fact that the immigration status was a primary concern for the Petitioner.

None of those factors surrounding Petitioner were considered by the COA in its conclusion that the immigration status was not a primary concern for the Petitioner.

What the COA describes as repeated warnings from the trial court, are just the trial court's admonishments stating to the Petitioner that *he could be deported*.  That

---

[16] 3 RR 46

specific type of warning was considered and rejected by the Supreme Court in *Padilla, supra..* As Justice Alito himself conceded; "the Court's opinion *would not just require defense counsel to warn the client of a general risk of removal; it would also require counsel, in at least some cases, <u>to specify what the removal consequences of a conviction would be</u>." Padilla,* 559 U.S. at 377 (Alito, J. concurring) (emphasis added) The stark difference between the two is aptly illustrated by Honorable Robert L. Hinkle, addressing the government's argument that a defendant pleading to an aggravated felony need only know that deportation was a possibility: "Well, I know every time that I get on an airplane that it could crash, but if you tell me it's going to crash, I'm not getting on." *United States v. Choi*, 581 F. Supp. 2d 1162 (N.D. Fla. 2008), Transcript of Motion Hearing (Sept. 24, 2008).

In sum, Petitioner respectfully submits to the consideration of this Honorable Court that by failing to account for the particular circumstances previously discussed, the COA erred in its conclusion the immigration status was no a primary concern for the Petitioner.

    D) *Deferred adjudication is not an option for a non-citizen when the predicate conviction is going to place the non-citizen in removal proceedings:*

As previously discussed, deferred adjudication probation is considered a conviction for immigration purposes. Particularly, Petitioner's conviction made him

-23-

instantly removable because the conviction made him immediately an outlaw in the eyes of the immigration authorities. A sort of fugitive. In other words, because Petitioner's conviction made him instantly removable from the United States, the immigration authorities had the duty under the law to track him down, arrest him and put him in removal proceedings. To make matters even worse, Petitioner's conviction made him subjected to mandatory detention.[17]

Based upon the foregoing, deferred adjudication was not an option for Petitioner because after his arrest and detention by the immigration authorities, Petitioner was not going to be able to report to his Community Supervision Officer.

May be the best explanation of why deferred adjudication probation was not a realistic option for a non-citizen like the Petitioner was provided by one of the witnesses presented by the State during the Habeas Corpus hearing; Harris County Assistant District Attorney, Tim Ballengee. *Duque*, at \*10

The trial court found that the testimony offered by Harris County Assistant District Attorney (ADA), Tim Ballengee was credible. *Id*., at \*10

ADA Ballengee made the following statements during his direct examination at the Habeas' hearing:

> Question.    "What was unique about the plea circumstances?
>
> Answer.    We did -- my recollection was that we did Padilla

---

[17] INA, Section 236(c)

warnings on the plea but that he was receiving deferred adjudication, which was odd considering that he was most likely -- well, *he was going to be deported as a result of pleading to a deferred adjudication in my understanding*. (emphasis added)

Question.     Why did you think he was going to be deported, taking a deferred adjudication?

Answer.     *My experience just in the -- these kind of cases, and specifically assault family member cases, is that they are typically deported. It's almost certain.*     And then, also -- well, also when we were taking the plea, that was what he was told. "[18] 3 RR 55-56

There was no logical reason why Petitioner should have accepted the State's plea offer. Therefore, the COA erred by not taken into account in its analysis of prejudice, the fact that deferred adjudication probation was not an option for the Petitioner. As it turned out, the State's plea offer ended up removing the Petitioner from this Country and from his family.

**PRAYER FOR RELIEF**

This Petition should be granted.

---

[18] Note: ADA Ballengee testified that Duque was told that he was going to be deported. However, the Habeas Judge made the following statement to clarify the Record:
"But just so the record is clear, I never tell anyone: I believe you will be deported, unless the lawyer tells me that. So, because I don't know how many years he has been a resident, I have no way of knowing the details that are part of the attorney-client relationship; **but I didn't tell him he would be**. I think he just admonished him so strongly that the prosecutor remembered it that way. **But if I would have told him he will be deported, I would have written that on the papers." 3 RR 82**

For the reasons stated in this Petition for Discretionary Review the Petitioner prays that this Court revokes the Opinion and judgment of the First Court of Appeals.

Petitioner also requests such other and further relief as is just.

**RESPECTFULLY SUBMITTED:**

Rivera y Bujosa Law Office


_/s/ Octavio M. Rivera-Bujosa

Octavio M. Rivera-Bujosa
SBN 24081261
333 Simonton Street, Suite 210
Conroe, Texas 77301
Phone: (832) 296-6048
Fax: (936) 756-5961
oriverabujosahou@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2015, a true and correct copy of this Petition for Discretionary Review was served on Melissa Hervey, Harris County Assistant District Attorney, by email to Hervey_Melissa@dao.hctx.net, on Stacey M. Goldstein and the State Prosecuting Attorney, by email to information@spa.texas.gov and to Lisa.McMinn@spa.texas.gov, and on the Harris County District Attorney, by e-mail to da@dao.hctx.net See Tex. Rule App. Proc. 9.5 (2015) and Tex. Rule App. Proc. 68.11 (2015)

_/s/ Octavio M. Rivera-Bujosa
Octavio M. Rivera-Bujosa


**CERTIFICATE OF COMPLIANCE**

This certifies that this document complies with the type-volume limitations because this document is computer-generated and does not exceed 4,500 words. Using the word-count feature of Microsoft Word, the undersigned certifies that this document contains 4,495 words in the document except in the following sections: caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix. This document also complies with the typeface requirements because it has been prepared in a proportionally-spaced typeface using 14-point font. See Tex. Rule App. Proc. 9.4 (2015).

_/s/ Octavio M. Rivera-Bujosa
Octavio M. Rivera Bujosa

**IN THE TEXAS
COURT OF CRIMINAL APPEALS**

JOSE E. DUQUE,

       Petitioner,

vs.                       No. _____

THE STATE OF TEXAS,

       Respondent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*

# APPENDIX –
# PETITION FOR DISCRETIONARY
# REVIEW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*

**Index:**

1-22          Court of Appeals Opinion dated September 15, 2015 and Judgment

 23          8 U.S.C. § 1101 (a)(48)(A)

24-25         8 U.S.C. § 1182 (a)(2)(A)(ii)

 26          8 U.S.C. § 1226 (c)

27-29         3 RR 10-12

30-31         3 RR  14-15

32            3 RR 18

33-34         3 RR 20-21

35          3 RR 27

36          3 RR 46

37-38       3 RR 55-56

# IN THE TEXAS
## COURT OF CRIMINAL APPEALS

JOSE E. DUQUE,

      Petitioner,

vs.                                 No. _____

THE STATE OF TEXAS,

      Respondent.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# APPENDIX –
# PETITION FOR DISCRETIONARY REVIEW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Index:**

| | |
|---|---|
| 1-22 | Court of Appeals Opinion dated September 15, 2015 and Judgment |
| 23 | 8 U.S.C. § 1101 (a)(48)(A) |
| 24-25 | 8 U.S.C. § 1182 (a)(2)(A)(ii) |
| 26 | 8 U.S.C. § 1226 (c) |
| 27-29 | 3 RR 10-12 |
| 30-31 | 3 RR 14-15 |
| 32 | 3 RR 18 |
| 33-34 | 3 RR 20-21 |

| | |
|---|---|
| 35 | 3 RR 27 |
| 36 | 3 RR 46 |
| 37-38 | 3 RR 55-56 |



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00014-CR
_____

## EX PARTE JOSE E. DUQUE, Appellant

_____

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1363049-A**

_____

## MEMORANDUM OPINION

Appellant, Jose E. Duque ("Duque"), appeals from the denial of his post-conviction application for a writ of habeas corpus. Duque, in his sole issue, contends that his plea counsel's failure to provide accurate immigration advice, required under *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473 (2010), resulted in ineffective assistance of counsel in violation of the Sixth Amendment and, as a

1

result, rendered his 2012 guilty plea involuntary. We hold that the trial court acted within its discretion in denying the application and affirm.

## BACKGROUND

Duque, a native of Honduras, entered the United States in 1997 and obtained lawful permanent resident status on March 19, 2011. On October 1, 2012, Duque was charged with the third-degree felony offense of assault of a family member— impeding breathing. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), (b)(2)(B) (West Supp. 2014). On October 8, 2012, Duque, through his plea counsel, Raul Rodriguez, pleaded guilty pursuant to an agreement that the prosecutor would recommend that Duque receive two years deferred adjudication and be assessed a $200.00 fine. *See* TEX. PENAL CODE ANN. § 12.34 (West Supp. 2014).

On October 8, 2012, the trial court deferred making any finding on Duque's guilt, ordered Duque be placed on deferred adjudication community supervision for two years, and assessed a $200.00 fine. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, §§ 3(b), 5(a) (West Supp. 2014). The record shows that Duque waived his right to have a court reporter record the plea hearing.[1]

On April 22, 2013, the U.S. Department of Homeland Security initiated removal proceedings against Duque by issuing a Notice to Appear before an

---

[1] Because the clerk's record did not contain the guilty plea or plea admonishment papers, the trial clerk filed a supplemental clerk's record on June 25, 2015, after the Clerk of this Court requested those documents. One of the Statement and Waivers of Defendant, initialed by Duque, states that he waived the right to have the court reporter record his plea.

immigration judge. The Notice to Appear stated that Duque was recently adjusted to lawful permanent resident status, but that his October 8, 2012 conviction for the felony crime of assault of family/house member—impeding breathing, which was committed against the complainant, a person protected from domestic violence by the laws of any state, rendered him removable. Soon afterwards, U.S. Immigrations and Customs Enforcement ("ICE") apprehended Duque, placed him on an immigration hold, and instituted deportation/removal proceedings.

ICE charged that Duque was subject to removal from the United States, apparently under sections 237(a)(2)(A)(i) and 237(a)(2)(E)(i) of the Immigration and Nationality Act ("INA"). Section 237(a)(2)(A)(i) provides that:

> Any alien who—
>
> (I)   is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j) of this title) after the date of admission, and
>
> (II)  is convicted of a crime for which a sentence of one year or longer may be imposed,
>
> is deportable.

8 U.S.C.S. § 1227(a)(2)(A)(i) (LexisNexis 2007 and Supp. 2014). Also, Section 237(a)(2)(E)(i) provides that:

> Any alien who at any time after admission is convicted of a crime of domestic violence, . . . is deportable. For purposes of this clause, the

term "crime of domestic violence" means any crime of violence . . . by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any State, Indian tribal government, or unit of local government.

8 U.S.C.S. § 1227(a)(2)(E)(i) (LexisNexis 2007 and Supp. 2014).

The Attorney General of the United States "may cancel removal in the case of an alien who is inadmissible or deportable from the United States if the alien (1) has been an alien lawfully admitted for permanent residence for not less than 5 years, (2) has resided in the United States continuously for 7 years after having been admitted in any status, and (3) has not been convicted of any aggravated felony." 8 U.S.C.S. § 1229b(a) (LexisNexis 2007 and Supp. 2014). On March 24, 2014, Duque claimed that the immigration judge denied his application to cancel removal and ordered him removed.

On May 19, 2014, Duque, through habeas counsel Octavio M. Rivera, filed an application for a writ of habeas corpus, under Texas Code of Criminal Procedure article 11.072. Duque claimed that his plea counsel, Rodriguez, provided ineffective assistance of counsel by failing to advise him about the immigration consequences of his plea, as required under *Padilla*, 559 U.S. at 374, 130 S. Ct. at 1486, and thus, rendered his plea involuntary. Duque submitted an affidavit stating that Rodriguez did not advise him that his removal was "virtually mandatory" as a result of his conviction. Duque stated that he was put in removal

4

proceedings as a result of his conviction, he found out during removal proceedings that he was not eligible to apply for any discretionary relief, and he was ordered to be removed on March 24, 2014. Duque's affidavit further alleged that if he had known that his guilty plea would have made his deportation virtually mandatory or that he would not qualify for discretionary relief, he would not have pleaded guilty and would have gone to trial.

Duque also submitted an affidavit from his plea counsel, Raul Rodriguez. Rodriguez's affidavit stated that, because he was unaware that assault of a family member—impeding breathing was considered a crime involving moral turpitude or domestic violence for immigration purposes such that it would make Duque subject to automatic deportation, he "did not inform Mr. Duque of it." Rodriguez's affidavit further stated that, because he was unaware that a crime involving moral turpitude within the seven-year period after admission would prevent a legal permanent resident from applying for cancellation of removal during removal proceedings, he "did not inform Mr. Duque of it."

**The Habeas Court's Hearing and Findings of Fact and Conclusions of Law**

Before denying appellant's habeas application on November 21, 2014, the trial judge stated that she had reviewed the affidavits attached to Duque's habeas application, the evidence presented at the writ hearing, and official court records in the underlying proceeding. The court held a writ hearing on September 23 and

5

October 2, 2014, in which Duque's immigration law expert, Mayda Gil de Lamadrid, his plea counsel, Raul Rodriguez, and Duque testified.

Although Rodriguez testified that he had informed Duque that he could be deported because of his guilty plea, Rodriguez was unaware that because the crime involved moral turpitude that Duque was automatically going to be put into removal proceedings. The trial judge noted during Rodriguez's testimony at the writ hearing that she recalled asking Rodriguez at the 2012 plea hearing whether Duque was a permanent resident and informing Duque he could be deported, both of which Rodriguez confirmed. The trial judge noted that it was her handwriting on one of Duque's plea papers, filed on October 8, 2012, and attached as an exhibit to the findings and conclusions, that stated, "Per attorney, [defendant] is permanent resident. Defendant understands he could be deported."

Duque, via a Spanish interpreter, testified that Rodriguez told him that he could be removed following his guilty plea, but not that the immigration authorities were going to arrest him and seek to deport him automatically. The trial court did not permit the State to cross-examine Duque regarding whether he thought there was a strong case against him or not. Duque further testified on cross-examination that he was taken into immigration custody immediately after he pleaded guilty in October 2012.

The responding Houston Police Department Officer Kevin Truong and Tim Ballengee, the assistant district attorney (ADA) at Duque's 2012 plea hearing, testified for the State. At the end of the writ hearing, although stating that she "th[ought] it [was] a close call," the trial court recommended denying the writ on the record and requested the State and Duque's writ hearing counsel, Mr. Rivera, to prepare proposed findings of fact and conclusions of law.

On November 21, 2014, the trial court signed the State's proposed findings of fact and conclusions of law, and order. The court made the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The Court finds that the applicant was convicted on October 8, 2012, out of the 184th District Court, Harris County, Texas, in cause number 1363049, where the applicant entered a plea of guilty to the third degree felony offense of Assault-Family Member/Impeding Breath. However, the Court withheld a finding of guilt and the applicant was sentenced to a 2 year Deferred Adjudication and a $200.00 fine. . . .

2. The applicant did not directly appeal his conviction.

3. On March 8, 2013, the Court filed a Motion to Adjudicate on the applicant due to his admission to probation staff that he had consumed alcohol on February 17, 2013. . . .

4. On April 2, 1013, the Court amended the applicant's Deferred Adjudication conditions by giving the applicant 25 days jail therapy and adding 2 Alcohol Anonymous meetings a week.

5. The State dismissed the Motion to Adjudicate on April 2, 2013, after additional conditions were added to the applicant's Deferred Adjudication. . . .

7

6. On April 2, 2014, the Court filed a second Motion to Adjudicate due to the applicant not reporting to his Community Supervision Officer as ordered. . . .

7. The Court finds that the applicant is currently on deferred adjudication.

8. The Court finds, based on the application, that the applicant is a legal permanent resident in the United States.

9. The Court finds based on the court reporter's record that the applicant was properly admonished and informed of the potential immigration consequences of his plea consistent with TEX. CODE CRIM. PROC. Art. 26.13.

10. The Court finds, based on the clerk's record, that on the face of the applicant's plea agreement with the State that he was admonished:

    "by the Court and the defense attorney that if he is in the USA illegally or is not a US citizen, he/she may be deported back to his/her country. The defendant also acknowledged in open court that neither their attorney nor anyone else has indicated or promised otherwise."[2]

11. The Court finds that the applicant was represented by Mr. Raul Rodriguez ("Rodriguez") in his primary case.

12. The Court finds that the testimony offered by the applicant's previous attorney, Raul Rodriguez, was credible.

13. The Court finds based on the credible testimony of Rodriguez, that Rodriguez was aware that the applicant was not a United States citizen.

14. The Court finds based on the Court reporter's record of Rodriguez [sic] that Rodriguez informed the applicant that a

---

[2] The general admonishments state, in pertinent part, with Duque's initials indicating that he understood them, that "if you are not a citizen of the United States of America, a plea of guilty or nolo contendere for the offense with which you are charged in this case may result in your deportation, or your exclusion from admission to this country, or your denial of naturalization under Federal law."

conviction could result in the applicant's potential deportation from the country.

15. The Court finds based on the Court reporter's record of Rodriguez [sic] that while taking the applicant's plea the Court confirmed that Rodriguez had informed the applicant that he could be deported based upon the plea. . . .[3]

16. The Court finds that the testimony from Harris County Assistant District Attorney, Tim Ballengee, [is] credible.

17. The Court finds, based on the Court reporter's record, that the testimony of Tim Ballengee referring to admonishments and immigration consequences given at the time the applicant took his plea [is] credible.

18. The Court finds that the testimony given by Officer K. Truong, referring to the strength of the State's case against the applicant [is] credible.

19. The Court finds, based on the totality of the evidence presented, assertions made, and the testimony given that the applicant was not credible.

20. The Court finds the applicant's assertion that he would not have pled guilty but for the alleged deficient conduct but would have insisted on going to trial is not credible.

21. The Court finds that the applicant's plea was voluntary.

22. The Court finds that the assertion made by applicant that he was automatically deported following his voluntary plea, [is] not credible.

23. The Court finds that the applicant entered his plea agreement on October 8, 2012.

---

[3] The trial judge was referring to the writ hearing record when she confirmed that Rodriguez had told her that Duque was a permanent resident and that Duque was informed that he could be deported. As noted above, the trial judge confirmed that it was her handwriting on one of Duque's plea papers, attached as an exhibit to the findings and conclusions, that stated, "Per attorney, [defendant] is permanent resident. Defendant understands he could be deported."

24. The Court finds that deportation proceedings were not initiated until April 22, 2013. . . .

25. The Court finds based on the Court reporter's record, and consistent with the Court's previous ruling, the applicant's writ is denied.

## CONCLUSIONS OF LAW

1. The applicant fails to show that counsel's conduct fell below an objective standard of reasonableness and that, but for trial counsel's alleged deficient conduct, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting the *Strickland* standard in Texas); and *Narvaiz v. State*, 840 S.W.2d 415, 434 (Tex. Crim. App. 1992) (defining the two-part *Strickland* standard).

2. The totality of the representation afforded the applicant was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

3. The applicant fails to show that his initial guilty plea was unlawfully induced, made involuntarily, or made without an understanding of the nature of the charge against him and the consequences of his plea.

4. The applicant fails to overcome the presumption that his initial guilty plea was knowingly and voluntarily made. *Wilson v. State*, 716 S.W.2d 953, 956 (Tex. Crim. App. 1986); *Fuentes v. State*, 688 S.W.2d 542, 544 (Tex. Crim. App. 1985).

5. In all things, the applicant has failed to demonstrate that his conviction was improperly obtained.

10

Duque filed his notice of appeal from the denial of his habeas application in the trial court on November 24, 2014.[4] After this Court abated the appeal because the clerk's record did not contain the trial court's certification of the right of appeal, the trial clerk filed a supplemental clerk's record on May 29, 2015, containing the trial court's certification that Duque has the right of appeal from the denial of his habeas application.

## DISCUSSION

In his sole issue, Duque asserts that the trial court abused its discretion in denying his habeas application because he received ineffective assistance of counsel. He claims that, because his plea counsel failed to advise him of the immigration consequences of his 2012 guilty plea, in violation of *Padilla*, 559 U.S. at 374, his guilty plea was rendered involuntary.

### A. Standard of Review

"An applicant seeking habeas corpus relief on the basis of an involuntary guilty plea must prove his claim by a preponderance of the evidence." *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006); *see also Ex parte Mandujano*, No. 01-12-00922-CR, 2013 WL 4007801, at *3 (Tex. App.—Houston [1st Dist.] Aug. 6, 2013, no pet.) (mem. op., not designated for publication). The applicant

---

[4] On January 8, 2015, the trial clerk filed an affidavit in this Court stating that there had been a delay in forwarding and processing Duque's notice of appeal which, in turn, delayed the forwarding of the appeal to this Court. The Clerk of this Court did not receive Duque's notice of appeal until January 7, 2015.

11

bears the burden to establish that a reasonable probability exists that, but for counsel's advice, he would not have pleaded guilty and would have insisted on going to trial. *See Ex parte Ali*, 368 S.W.3d 827, 835 (Tex. App.—Austin 2012, pet. ref'd). Further, the applicant must show that a decision to reject the plea bargain would have been rational under the circumstances. *See id.* (citing *Padilla*, 559 U.S. at 372, 130 S. Ct. at 1485).

When reviewing a trial court's ruling on a habeas corpus application, we view the evidence presented in the light most favorable to that ruling, and we must uphold that ruling absent an abuse of discretion. *See Ex parte Mandujano*, 2013 WL 4007801, at *3 (citing *Ex parte Ali*, 368 S.W.3d at 831). We "afford almost total deference to a trial court's fact findings in habeas proceedings, especially when those findings are based upon credibility and demeanor." *Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex. Crim. App. 2006) (quoting *Ex parte White*, 160 S.W.3d 46, 50 (Tex. Crim. App. 2004)). We similarly defer to the trial court's application of the law to the facts if that resolution turns upon credibility and demeanor determinations. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). If the resolution of the ultimate question turns on an application of law, we review the determination de novo. *See Ex parte Mandujano*, 2013 WL 4007801, at *3 (citing *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App.

12

App. 2003), *overruled in part on other grounds by Ex parte Lewis*, 219 S.W.3d 335, 371 (Tex. Crim. App. 2007)).

In an article 11.072 habeas case, the trial judge is the sole finder of fact. *See Ex parte Obi*, 446 S.W.3d 590, 596 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citing *Ex parte Garcia*, 353 S.W.3d 785, 788 (Tex. Crim. App. 2011)). An appellate court reviews the evidence presented in the light most favorable to the trial court's ruling, regardless of whether the court's findings are implied or explicit, or based on affidavits or live testimony, provided they are supported by the record. *See Ex parte Murillo*, 389 S.W.3d 922, 926 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

Nevertheless, while we give deference to any underlying historical fact determinations made by the habeas court, we review the ultimate question of prejudice under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), de novo. *See Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005); *Ex parte Murillo*, 389 S.W.3d at 927. We will uphold the habeas court's judgment as long as it is correct under any theory of law applicable to the case. *See Ex parte Taylor*, 36 S.W.3d 883, 886 (Tex. Crim. App. 2001) (per curiam); *Ex parte Murillo*, 389 S.W.3d at 926.

## B.     Applicable Law

In *Padilla,* the Supreme Court held that the Sixth Amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea.   559 U.S. at 374, 130 S. Ct. at 1486.   Counsel's performance is deficient if counsel fails to advise a noncitizen client about deportation consequences that are "truly clear." *Padilla*, 559 U.S. at 369, 130 S.Ct. at 1483; *see also Ex parte Altobji*, No. 01-14-01008-CR, 2015 WL 505202, at *2 (Tex. App.—Houston [1st Dist.] Feb. 5, 2015, no pet.) (per curiam) (mem. op., not designated for publication).   "When the law is not succinct and straightforward," however, counsel "need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla*, 559 U.S. at 369, 130 S.Ct. at 1483; *see also Ex parte Pho Ri Ma*, No. 01-14-00462-CR, 2014 WL 4783007, at *2 (Tex. App.—Houston [1st Dist.] Sept. 25, 2014, pet. ref'd) (mem. op., not designated for publication). Because Duque entered his plea in 2012 after *Padilla* was decided, *Padilla* applies here. *See Chaidez v. United States*, 133 S. Ct. 1103, 1113 (2013); *see also Ibarra v. State*, 445 S.W.3d 285, 287 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd); *Ex parte Mandujano*, 2013 WL 4007801, at *2.

The two-pronged *Strickland* test applies to challenges to guilty pleas, such as the one in the present case, premised on ineffective assistance of counsel. *See Ex*

14

14

*parte Obi,* 446 S.W.3d at 596 (citing *Hill v. Lockhart,* 474 U.S. 52, 58, 106 S. Ct. 366, 370 (1985)). Thus, to be entitled to relief, appellant was required to show by a preponderance of the evidence that (1) trial counsel's performance fell below the objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687–88, 694, 104 S. Ct. at 2064, 2068.

"'In the *Padilla* context, when the prejudice prong of the *Strickland* test is dispositive, we need address only that prong on appeal.'" *Ex parte Obi,* 446 S.W.3d at 596 (quoting *Ex parte Murillo,* 389 S.W.3d at 927). We make the prejudice inquiry on a case-by-case basis, considering the circumstances surrounding the plea and the gravity of the alleged failure. *Id.* (citation omitted). "'[I]t is not necessary to determine whether trial counsel's representation was deficient if appellant cannot satisfy the second *Strickland* prong.'" *Id.* (quoting *Ex parte Murillo,* 389 S.W.3d at 927).

## C.    Analysis

Duque contends that the habeas court erred in denying him relief because Rodriguez failed to advise Duque that his deportation was virtually mandatory, as required by *Padilla,* 559 U.S. at 369, and he asserts that he would have insisted on going to trial had he known that he faced mandatory deportation following his guilty plea. The State contends that Rodriguez provided adequate assistance by

informing Duque that he may be deported after his guilty plea and that, in any event, he failed to establish prejudice.

As noted above, there is no need to analyze the first *Strickland* prong if the second prong, prejudice, is dispositive. *See Ex parte Obi*, 446 S.W.3d at 596 (citation omitted). "The central question under the second [*Strickland*] prong is whether it would have been rational under the circumstances for the applicant to reject the plea bargain." *Id.* (citations omitted). We examine whether Duque's insistence on a trial would have been rational under the circumstances in light of the following four factors: (1) whether there is evidence of the applicant's guilt, (2) whether the applicant had any factual or legal defenses, (3) whether immigration status was his primary concern, and (4) how the plea deal compared to the penalties risked at trial. *Id.* at 597 (citation omitted).

With respect to the first factor, evidence of guilt, the trial court found Officer Truong's testimony, referring to the strength of the State's case against Duque, credible. We defer to the trial court's credibility findings on this issue. *See Ex parte Amezquita*, 223 S.W.3d at 367. The evidence developed at the writ hearing supported the trial court's finding No. 18 that the State had strong evidence, because Officer Truong testified that he spoke with the complainant, and the complainant's son who witnessed the altercation, and Officer Truong observed visible marks on the complainant's neck, all of which would likely have secured a

16

conviction. Thus, the first factor weighs strongly in favor against a finding of prejudice because there was substantial evidence of Duque's guilt.

As for the second factor, we consider whether Duque had a defense to the charged offense. *See Ex parte Obi*, 446 S.W.3d at 598 (citations omitted). Duque did not raise any allegations in his affidavit regarding whether he thought he had a defense, other than to state that his family had hired Rodriguez to represent him because he wanted to go to trial. The trial court, at the writ hearing, did not permit the State to cross-examine Duque regarding whether he thought there was a strong case against him or not. However, the trial court found that Duque's plea was voluntary and that he failed to show that it was unlawfully induced or made without an understanding of the nature of the charge against him and the consequences of the plea. As noted above, we must defer to the trial court's factual findings. *See Ex parte Amezquita*, 223 S.W.3d at 367. Thus, this second factor weighs against a finding of prejudice. *See Ex parte Obi*, 446 S.W.3d at 598.

With respect to the third factor—immigration status as primary concern— courts consider whether the applicant presented evidence indicating that the immigration consequences of his plea were his paramount concern. *See Ex parte Obi*, 446 S.W.3d at 598. "'An applicant's failure to express concerns about immigration consequences after receiving repeated warnings weighs against finding prejudice.'" *Id.* (quoting *Ex parte Murillo*, 389 S.W.3d at 930). Duque's

17

statements, in his affidavit and at the writ hearing, that he would have insisted on going to trial if he knew that the guilty plea would have made his deportation virtually mandatory, were made after-the-fact. There was no evidence that Duque expressed these concerns before pleading guilty, despite receiving multiple warnings about possible immigration consequences from both Rodriguez and the trial judge. *See Ex parte Obi*, 446 S.W.3d at 598 (citation omitted).

Moreover, at the writ hearing, Duque and his plea counsel, Rodriguez, disputed whether Rodriguez had properly advised Duque about the effect of a guilty plea on his immigration status. The trial court found that, based on the clerk's record, on the face of the plea agreement, Duque was admonished by the court and the defense attorney at the time of his plea that if he was not a U.S. citizen, that he may be deported back to his country. Similarly, the trial court found that the testimony offered by Rodriguez was credible, that Rodriguez was aware that Duque was not a U.S. citizen, and that both Rodriguez and the court had informed Duque that a conviction could result in his deportation.

Furthermore, the trial court found ADA Ballengee's testimony, referring to the admonishments and immigration consequences that were given at the time of Duque's plea, credible. The trial court found that Duque's assertion that he would not have pleaded guilty, but for the alleged deficient conduct by his plea counsel and would have insisted on going to trial, was not credible. Finally, the trial court

18

found that Duque's other assertion, that he was automatically deported following his voluntary plea, was not credible because he entered his plea agreement on October 8, 2012, and deportation proceedings were not initiated until April 22, 2013. The trial court did not credit Duque's self-serving testimony and, given the conflicting evidence, was free to disregard it. *See Ex parte Obi*, 446 S.W.3d at 599 (citation omitted). As noted above, we must defer to the trial court's finding on these issues, as their resolution turns on an evaluation of the witnesses' credibility and demeanor. *See Ex parte Amezquita*, 223 S.W.3d at 367. Therefore, this third factor weighs against a finding of prejudice.

Finally, with respect to the fourth factor—how the plea deal compared to the penalties risked at trial—we consider three additional subfactors: (1) evidence concerning the likelihood of success at trial, (2) evidence presented by the applicant that some other plea deal would have helped him avoid negative immigration consequences, and (3) evidence presented by the applicant regarding the likelihood of obtaining probation if convicted at trial. *See Ex parte Obi*, 446 S.W.3d at 599 (citation omitted). As noted above, Duque was charged on October 1, 2012 with the third-degree felony offense of assault of a family member— impeding breathing. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), (b)(2)(B) (West Supp. 2014). For the first risk subfactor, there was substantial evidence of

19

Duque's guilt. Thus, the evidence concerning the likelihood of success at trial favored the State. *See Ex parte Obi*, 446 S.W.3d at 600.

With respect to the second risk subfactor, Duque did not present any evidence at the writ hearing or in his habeas application that some other plea deal would have helped him avoid negative immigration consequences. If convicted after trial of a third-degree felony, Duque faced a minimum of two years and a maximum of ten years in prison and up to a $10,000.00 fine. *See* TEX. PENAL CODE ANN. § 12.34 (West Supp. 2014). The terms of Duque's favorable plea bargain included no jail time in exchange for the trial court placing him on two years deferred adjudication and assessing a $200.00 fine.

Similarly, as for the third, and final, risk subfactor, the likelihood of obtaining probation if convicted after trial, although Duque may have been eligible for probation if convicted after trial, he failed to present any such evidence that probation was likely. *See Ex parte Obi*, 446 S.W.3d at 600. More importantly, if Duque were convicted at trial, he likely faced deportation regardless of whether he received probation. *See id.* Thus, we conclude that the penalties risked at trial, where Duque faced a significant likelihood of conviction with a minimum of two years' prison time, weigh against finding that Duque was prejudiced by his plea deal. *See id.* (citations omitted).

Consequently, after considering these four factors and giving appropriate deference to the trial court's findings of fact that Duque's plea counsel, Rodriguez, was credible and that Duque was not credible, we conclude that the trial court did not err in (1) finding Duque's testimony not credible and rejecting his assertion that he would have insisted on going to trial had he known that he faced mandatory deportation after pleading guilty; and (2) concluding that it would not have been rational for Duque to reject a plea deal under the circumstances. *See Ex parte Obi*, 446 S.W.3d at 600. Therefore, we hold that the trial court did not err in concluding that Duque failed to carry his burden of showing that, with respect to the second prong of *Strickland*, but for the alleged deficient conduct by plea counsel, there was a reasonable probability that he would have gone to trial. *See id.* (citing, *inter alia, Ex parte Murillo*, 389 S.W.3d at 931–32) ("Aside from applicant's own self-serving statement that he would have insisted his counsel take his case to trial had he known he would be deported, he presented no other evidence corroborating his position that it would have been rational to reject a plea deal under the circumstances."); *see also Ex parte Mandujano*, 2013 WL 4007801, at *4 (holding that, with respect to second prong of *Strickland*, record supports trial court's finding that applicant opted for plea because, among other reasons, he did not want to risk going to jail, and failed to prove that he would have rejected plea and gone

21

to trial, but for any faulty advice). Accordingly, we hold that the trial court acted within its discretion in denying Duque habeas relief and we overrule his sole issue.

## CONCLUSION

We affirm the order of the trial court denying habeas relief.

## PER CURIAM

Panel consists of Justices Jennings, Higley, and Brown.
Do not publish. TEX. R. APP. P. 47.2(b).

**(48)**

**(A)** The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—

**(i)**

a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

**(ii)**

the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

23

## INA: ACT 212 - GENERAL CLASSES OF ALIENS INELIGIBLE TO RECEIVE VISAS AND INELIGIBLE FOR ADMISSION; WAIVERS OF INADMISSIBILLITY

Sec. 212. [8 U.S.C. 1182]

(a) Classes of Aliens Ineligible for Visas or Admission.-Except as otherwise provided in this Act, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

(1) Health-related grounds.-

(A) In general.-Any alien-

(i) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance; [1b]

(ii) [1] except as provided in subparagraph (C) [1a] who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,

(iii) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)-

(I) to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

(II) to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

(iv) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict, is inadmissible.

(B) Waiver authorized.-For provision authorizing waiver of certain clauses of subparagraph (A), see subsection (g).

(C) [1] EXCEPTION FROM IMMUNIZATION REQUIREMENT FOR ADOPTED CHILDREN 10 YEARS OF AGE OR YOUNGER.--Clause (ii) of subparagraph (A) shall not apply to a child who--

(i) is 10 years of age or younger,

(ii) is described in section subparagraph (F) or (G) of section 101(b)(1)(F), and [1c]

(iii) is seeking an immigrant visa as an immediate relative under section 201(b), if, prior to the admission of the child, an adoptive parent or prospective adoptive parent of the child, who has sponsored the child for admission as an immediate relative, has executed an affidavit stating that the parent is aware of the provisions of subparagraph (A)(ii) and will ensure that, within 30 days of the child's admission, or at the earliest time that is medically appropriate, the child will receive the vaccinations identified in such subparagraph.

(2) Criminal and related grounds.-

(A) Conviction of certain crimes.-

(i) In general.-Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of-

(I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime, or

(II) a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), is inadmissible.

(ii) Exception.-Clause (i)(I) shall not apply to an alien who committed only one crime if-

(I) the crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States, or

(II) the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

25

8 U.S. Code § 1226 - Apprehension and detention of aliens

(a) Arrest, detention, and releaseOn a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General—

(1) may continue to detain the arrested alien; and

(2) may release the alien on—

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

(b) Revocation of bond or parole

The Attorney General at any time may revoke a bond or parole authorized under subsection (a) of this section, rearrest the alien under the original warrant, and detain the alien.

(c) Detention of criminal aliens

(1) CustodyThe Attorney General shall take into custody any alien who—

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence [1] to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

1

26

**A.**     Yes, I am.

**Q.**     Okay.  And did you at any point have an opportunity to represent Mr. Duque in a criminal matter?

**A.**     Yes, I did.

**Q.**     Okay.  Would you tell the Court and brother counsel for the Government what kind of case was that and what was your involvement in that representation of Mr. Duque?

**A.**     I was appointed to represent Mr. Duque back in 2012, and he was charged with an offense of assault -- felony assault, third-degree felony of assault by impeding breathing.

**Q.**     Okay.  And did you have a chance to speak with him about that?

**A.**     I did.  Uh-huh (affirmative.)  Mr. Duque and I spoke about the charge that he had, and we had a conversation about what -- you know, what he was charged with and the facts that were presented to me by the State.

**Q.**     Okay.  And when you met Mr. Duque, was he out on bond?  Was he incarcerated?  Where did you meet him?

**A.**     He was incarcerated.

**Q.**     Okay.  And could you explain to the Court

27

how long did it take for that conversation, that meeting?

A.     I don't remember exactly, but it was a fairly lengthy meeting.  I would say 30 minutes to an hour.

Q.     Okay.  Besides that meeting -- or that conversation that you sustained with Mr. Duque, did you have another opportunity to meet with him and discuss his case and advise him about his case?

A.     No.  All the conversations that I had with Mr. Duque was in court.  He was in custody.  So, I spoke to him at the holdover cell, which is to the left of this courtroom.

Q.     Okay.  So, would it be fair to say that the only conversation that you sustained -- that you only sustained one conversation with Mr. Duque about his case and it was while he was in the holdover cell?

A.     That's correct.

Q.     That's correct.  Okay.  And that it took more or less like 30 minutes, correct?

A.     Thirty minutes to an hour, something like that, yes, sir.

Q.     Okay.  And what happened?  What -- I mean -- I mean, what advice, if any, did you give Mr. Duque on that occasion during that -- during that

meeting?

A.     I was given the file that the State had that contained the offense report of what Mr. Duque was being charged with.  I went over the facts of that with Mr. Duque.  I had a conversation with him about it.  Then I asked the State about what is it that they wanted to do as far as maybe making a recommendation, and I was given a recommendation by the State that they would offer Mr. Duque a two-year deferred adjudication probation if he were to decide to plea.

I went back to Mr. Duque, I informed him of what his options were.  I informed him that he has an option to go to trial; or that the State is offering him a punishment if he decides, you know, to plead.  And I informed him the type of punishment and informed him it was a two-year deferred adjudication.  And Mr. Duque decided to go ahead and plead and accept the two-year deferred adjudication probation.

Q.     Okay.  Did you know -- did you find out at any point during that conversation that he wasn't -- that he was not a U.S. citizen?

A.     I was informed by Mr. Duque, if I remember correctly, that he was not a U.S. citizen, yes.

Q.     Okay.  And, Mr. Rodriguez, for this

29

A.     Yes, sir, I did.

Q.     And what was the purpose of that affidavit, sir?

A.     The -- you had asked me, Mr. Rivera, to prepare an affidavit in reference to a Writ of Habeas Corpus that you were doing for Mr. Duque.  And the purpose of this affidavit is so that I could, you know, let you know what type of information or noninformation that I gave Mr. Duque at the time that I represented him in 2012.

Q.     Okay.  And, specifically, did you at any point tell Mr. Duque during that short conversation that the crime to which he was pleading guilty was considered for immigration purposes a crime involving moral turpitude?

A.     No, I did not inform him of that.  No, sir.

Q.     Did you know at the time that that crime -- that the offense that he was alleged to have committed was considered a crime involving moral turpitude for immigration purposes?

A.     No, sir, I was not aware that the crime that he was being charged with was a crime involving moral turpitude for immigration purposes.

Q.     Okay.  Sir, during the time -- during that conversation that you had with Mr. Duque, did you at

any moment tell him that he was going to be put into removal proceedings as a result of the conviction for the offense that he was charged?

A.    No, sir, I did not inform him that.

Q.    Did you know at the time that that -- that immigration consequence of pleading guilty to that offense was that the person was -- was going to be put into removal proceedings?

A.    No, I was not aware of that.

Q.    Mr. Rodriguez, knowing what you know now about the immigration consequence of pleading guilty to the offense that Mr. Duque was charged with, would you give him the same advice that you gave him on that occasion when you advised him to plead guilty?

A.    No, I would not have.

Q.    Why not, sir?

A.    If I had known that the plea from Mr. Duque would result in his being -- having removal proceedings done against him by immigration, I would have advised him that he probably would consider going to trial on this case. So, had I known that that was going to happen, I would not have given him advice of taking a two-year deferred adjudication probation.

Q.    Okay.  Do you know why he is here today,

Q. Okay. And you have been in practice for 22 years now?

A. Yes, sir.

Q. When you hear that, what do you normally tell a defendant or a client?

A. As a general rule, what I tell a defendant who has informed me that he is a legal permanent resident, that a guilty plea could result in deportation, denial of naturalization or denial of citizenship under federal law. That's what I usually give advice to those defendants.

Q. And in a deferred, if a client or defendant messes that up, they could be adjudicated guilty?

A. That's correct. Yes, sir.

Q. So, there could be a guilty plea?

A. Yes, sir.

Q. And do you tell your clients that if they are found guilty, there could be ramifications?

A. Normally what I tell a defendant that's -- that is accepting a plea for deferred adjudication is that if he does not comply with the conditions of probation, that a Motion to Adjudicate could be filed and that he could be convicted of that offense and be sentenced to whatever range of punishment that the offense, you know, is for.

32

and ability to represent defendants?

A.    Yes, sir.

Q.    And you passed those?

A.    Yes, sir.

Q.    Have you been Court-appointed on few or many cases?

A.    Many cases.

Q.    About how many years?

A.    Oh, my God.  Ever since I first started practicing law.  I have been doing Court appointments the past 22 years.

Q.    So, at what point did you learn that a deferred could have someone removed?

A.    I've always known that a deferred could have someone removed if the person was not a U.S. citizen and he was not a legal permanent resident.

Q.    Okay.  So, I guess when did you learn that even a deferred for a legal permanent resident could be a deportable offense?

A.    In general, I have known that for probably the last year or so, as more of these Padilla writs are being filed -- more of these Padilla writs are being filed because of lack of information or advice that attorney gives the defendant.  And since then, I have had conversations with friends of mine that are

attorneys in -- immigration attorneys. And I would ask them, you know, some of the differences between some of the different charges that a person has and what the consequences are for immigration purposes.

Q. Did you know that a crime involving moral turpitude could make someone deportable?

A. I know that if -- my understanding of that is if the person is not a legal permanent resident, it could cause him to be deported, yes, sir.

Q. I guess my question is: Did you know that if someone is convicted of a crime of moral turpitude they were deportable? Not necessarily automatic, but they could be deported?

A. They could be deported, yes, I do understand that. Yes, sir.

Q. Okay. But you didn't know that assault family violence case was a crime of moral turpitude?

A. I did not know that, no, sir.

Q. Okay. Do you know if you told the Judge any warnings or conversation that you told the defendant about his immigration status?

A. I do not remember, no, sir.

Q. So, if there is a note saying that "Per the Defense counsel, defendant is aware of consequences," you don't know if that -- you wouldn't disbelieve it,

MR. RIVERA: No questions, Your Honor.

THE COURT: There is a notation in my handwriting on the plea papers, and it says: "Per attorney" -- I have it here -- "defendant is permanent resident." So, apparently after I gave the admonishment about deportation, I was concerned he might be deported.

THE WITNESS: Yes, ma'am.

THE COURT: And so, I asked you; and you said he is a permanent resident. And then in my handwriting it says: "Defendant understands he could be deported." So, that would not have come from you. After you told me that, I would have addressed him; and I made sure he understood he could be deported.

THE WITNESS: Yes, ma'am.

THE COURT: Do you have any disagreement with that?

THE WITNESS: No, I do not, Judge.

THE COURT: Okay. Anything further, sir? Mr. Rivera?

MR. RIVERA: Yes, Your Honor.

THE COURT: Anything further?

**FURTHER REDIRECT EXAMINATION**

Q. (BY MR. RIVERA) Mr. Rodriguez, you never heard Your Honor telling Mr. Duque that he was going

Your Honor?

THE COURT: It's perfect. Thank you.

Q. (BY MR. RIVERA) So, Mr. Duque, how many -- how many years have you been living in the United States?

A. More than 17 years.

Q. Besides the offense for which we are here today, have you ever been convicted of any offense during the 17-year period that you have been living in the United States?

A. No.

Q. Okay. And could you tell the Honorable Court and brother counsel for the Government if you have any children that are U.S. citizens?

THE WITNESS: Yes, Your Honor.

And also the Government, I have my wife; and I have four children. And this is the reason why I'm fighting, allow me a second opportunity because my children are minors and they do need me because my wife does not work.

Q (By Mr. Rivera) Okay. Mr. Duque, could you tell the Honorable Court and brother counsel what happened with your immigration case, with the proceedings that were before the immigration court?

A. Well, what happened in my case, the



A. Yes.

Q. Did you do that on few or many occasions?

A. Many.

Q. Okay. This specific case, do you remember the defendant, Mr. Duque?

A. I do, actually, yes.

Q. And how --

A. Well, let me rephrase that. I don't remember him specifically but I remember the case and I remember the name.

Q. And why do you remember the case?

A. He had a somewhat unique name, and the file had "Class A misdemeanor" or "Class A assault" written on the top. I recall that. And, also, the circumstances of the plea were fairly unique.

Q. What was unique about the plea circumstances?

A. We did -- my recollection was that we did Padilla warnings on the plea but that he was receiving deferred adjudication, which was odd considering that he was most likely -- well, he was going to be deported as a result of pleading to a deferred adjudication in my understanding.

Q. Why did you think he was going to be deported, taking a deferred adjudication?

A.    My experience just in the -- these kind of cases, and specifically assault family member cases, is that they are typically deported.  It's almost certain.  And then, also -- well, also when we were taking the plea, that was what he was told.

Q.    How do you know that he was told that?

A.    Before testifying today, I was able to review the file in this case; and I wrote on the file that Padilla warnings were given.  The only time that I would write Padilla warnings were given in the 184th or since was if it was specifically stated in the plea that the defendant would, in fact, be deported, not that they may.

Q.    So, to your recollection, was the defendant made aware that he most likely was going to be deported with taking this agreement?

A.    I'm sorry, could you ask it again?

Q.    Sorry.  From your recollection, from what you remember, did the defendant hear the possible consequences and that he most likely was going to be deported based off the note you made on the file and from what you remember of the plea?

A.    I don't remember the specific plea, but I know that the only time that I write on files "Padilla warnings given" is if they were specifically

38